UNITED STATES *v.* SHOTWELL MANUFACTUR-
ING CO. ET AL.

No. 1.   Argued October 17, 1957.—Decided December 16, 1957.

*Philip Elman* argued the cause for the United States. On the brief were *Solicitor General Rankin, Assistant Attorney General Rice, Leonard B. Sand* and *Joseph M. Howard.*

*George B. Christensen* argued the cause for respondents. With him on the brief were *Howard Ellis* and *William T. Kirby.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

This case presents an unusual question involving the integrity of a criminal trial in the federal courts.

The Solicitor General has filed a motion in this Court to remand the case to the District Court for further proceedings. This motion is based on a proffer of evidence

alleged to have come into the possession of the Government after the United States had petitioned for certiorari to review a decision of the Court of Appeals setting aside the conviction of the respondents. It is claimed that such evidence shows that the decision of the Court of Appeals was based upon a perjurious record attributable to the fraud of the respondents.

A clear appreciation of both the proceedings in the lower courts and the peculiar circumstances in which the Government's motion arises is essential to an understanding of why we believe the motion to remand must be granted.

In 1953 the respondents and Frank J. Huebner, after a jury trial in the United States District Court for the Northern District of Illinois, were convicted of willfully attempting to evade the 1945 and 1946 federal corporate income taxes of the Shotwell Manufacturing Company.[1] Prior to trial they moved for dismissal of the indictment on the ground that their voluntary and timely disclosure of these tax derelictions to the taxing authorities entitled them to immunity from prosecution under the Treasury's former "voluntary disclosure policy."[2] This motion was denied by the District Court after a pretrial hearing. Respondents and Huebner then moved, on the same

---

[1] Internal Revenue Code of 1939, § 145 (b), 53 Stat. 63. The Shotwell Company manufactured candy and marshmallows. Cain was President, Sullivan, Executive Vice President and General Counsel, and Huebner, Vice President. Huebner is no longer a respondent here. See notes 6 and 7, *infra*.

[2] Under that policy, first announced by the Treasury Department in 1945, the Department did not refer to the Department of Justice for prosecution cases of intentional income tax evasion where the taxpayers had made a clean breast of things to the Treasury before any investigation had been initiated by the Revenue Service. This policy was set forth in various informal announcements by Treasury officials, but was never formalized by statute or regulation. The policy was abandoned in January 1952.

ground, for suppression of the evidence obtained from them by the taxing authorities as a result of their alleged disclosure. After a further pretrial hearing, the District Court also denied this motion, later filing an opinion in which it found that the disclosure was not made in good faith.[3]

On appeal, the Court of Appeals affirmed as to the dismissal motion but reversed as to the suppression motion, set aside the convictions, and remanded the case for a new trial. 225 F. 2d 394.[4] The Court of Appeals found that the respondents' disclosure was bona fide, and also ruled that the disclosure was timely, an issue which the District Court had not reached.[5] The Government petitioned us for certiorari on the suppression issue and the respondents and Huebner cross-petitioned on the dismissal issue.[6] Thereafter, the Government filed its motion to remand, on which, as later amended and supplemented, respond-

---

[3] The propriety of this pretrial procedure is not before us.

[4] The Court of Appeals did not pass on other contentions made by the respondents in support of a reversal of their conviction.

[5] More specifically, the Court of Appeals held that there was an effective voluntary disclosure and that the Government's use of the evidence thereby obtained from the respondents violated their rights under the Self-Incrimination Clause of the Fifth Amendment. The District Court simply held that the alleged voluntary disclosure was defective, and did not discuss the Fifth Amendment. In the present posture of this case we do not reach the correctness of these rulings of the two lower courts, or any other question going to the merits of the respondents' conviction.

[6] We deferred consideration of the petition and cross-petitions for certiorari for some months on the basis of representations made by the Solicitor General in his letters of December 6, 1955, and June 1, 1956, which culminated in the filing of the Government's motion to remand. See 351 U. S. 980. As originally filed, the cross-petition was conditional on the Government's petition being granted. After the Government moved to remand, respondents withdrew the conditional limitation, and Huebner withdrew his cross-petition in its entirety.

ents and Huebner joined issue by the filing of answers.[7] Considering that the matters presented by the motion to remand raised an important issue affecting the proper administration of justice in the federal courts, we granted the Government's petition for certiorari, "limited to the issues raised in the amended motion to remand and supplement thereto and the respondents' answer to the amended motion to remand."[8] 352 U. S. 997. We denied the cross-petition for certiorari. 352 U. S. 998.

For an understanding of the significance of the newly discovered evidence[9] proffered by the Government some knowledge is required of the position taken by the defendants in the District Court on the suppression issue. The substance of that position was presented by Leon J. Busby, Shotwell's accountant, who testified at both the hearing on the motion to suppress and at the trial. He stated that the Shotwell Company in each of the years 1945 and 1946 had received substantial cash payments for black-market candy sales above O. P. A.

[7] Huebner later withdrew his answer and consented to the Government's motion.

[8] Respondents point out that this limitation of our writ in effect amounted to a denial of the Government's petition for certiorari, and therefore that the motion to remand, which was not before the Court of Appeals, must be regarded as an attempt to invoke an original jurisdiction which we do not possess. We shall dispose of respondents' point by vacating our limited writ and granting, *nunc pro tunc,* the Government's petition for certiorari, without restriction. This removes all question as to our jurisdiction, 28 U. S. C. § 2106; *Mesarosh* v. *United States,* 352 U. S. 1, and prejudices neither party because we shall decide only the issues raised by the motion to remand.

[9] Respondents have made no such showing in opposition to the Government's motion as would justify our questioning the accuracy of the Solicitor General's representation that the Government's proffered evidence is "newly discovered."

ceiling prices; [10] that these receipts were not recorded on Shotwell's books and were not reported in its income tax returns; that he first learned of these facts in the course of conversations with H. Stanley Graflund, Shotwell's comptroller, during a trip they took to New York early in January 1948; that immediately upon his return to Chicago he discussed the matter with respondents Cain and Sullivan; that he recommended disclosing the omissions to the taxing authorities; and that, at the direction of respondents, he revealed the entire affair to Ernest J. Sauber, Deputy Collector in Chicago, in a series of conferences beginning in the latter part of January 1948, at one or more of which conferences he was accompanied by Cain. He also testified that thereafter, acting under Sauber's instructions and assurances that only a civil liability was involved, he and his staff, with the assistance of Cain, Huebner and Graflund, conducted an exhaustive investigation over a period of several months to reconstruct the Shotwell figures on the black-market transactions. He said that these figures were furnished in August 1948 to a revenue agent for scrutiny.

Sauber and Cain gave similar testimony, except that Sauber fixed Busby's first visit to him at about the middle of March 1948. Cain's explanation of Shotwell's failure to report the black-market receipts in its income tax returns was that he believed such receipts were not taxable since they were used by Shotwell to purchase black-market supplies [11] and therefore gave rise to no profit. [12]

---

[10] The Government puts the figure at some $380,000; the respondents' figure is about $160,000.

[11] Except for the amount of $6,000 which was reported in the Shotwell returns.

[12] Although the Treasury policy at the time denied deductibility to such black-market expenditures, the courts later held that this kind of expenditure was deductible. See *Sullenger* v. *Commissioner*, 11 T. C. 1076.

In support of its motion the Government has filed with the Court the affidavits of Huebner and Graflund, which they executed after the Government filed its petition for certiorari. These affidavits paint a sharply different picture of the entire affair; indeed, they flatly contradict the tale unfolded on behalf of the respondents in the District Court. More specifically: (1) Graflund swears that the first time he discussed the black-market transactions with Busby was at Busby's home in late June 1948, at which time Busby gave no indication that he had previously known of these transactions; [13] (2) Graflund and Huebner swear that at no time prior to a meeting held in July 1948 were they ever advised or led to believe by respondents that Shotwell's black-market receipts had been disclosed to the Treasury; (3) Huebner swears that it was at this July 1948 meeting that Cain first told him that a voluntary disclosure would be made, and that Cain also gave him to understand that it had been "agreed" that the date of the disclosure "would be set at June 15, 1948"; [14] (4) Graflund and Huebner swear that prior to the middle of July 1948 no work was done by anyone to assemble records or data for the purpose of making a disclosure to

---

[13] According to Graflund's affidavit, it would appear that the respondents were spurred into action after Sam Krane, a Special Agent of the Internal Revenue Service, visited the Shotwell office on June 21, 1948. The affidavit states that Krane requested records and information relating to Shotwell's transactions with one David G. Lubben, from whom Shotwell had been receiving large sums of money which were not recorded in its regular books; that Graflund made certain records available to Krane and was "criticized" by the respondents for having done so; and that Graflund conferred with Busby within a few days after Krane's visit.

[14] In his affidavit Huebner states: "On November 13, 1952, Sauber testified at the hearing on the defendant's motion to suppress evidence that Busby and Cain had contacted him in March, 1948. After hearing Sauber testify, I told Cain I thought the voluntary disclosure date was supposed to be June 15, 1948. Cain said to me, 'Ssshhh! There is nobody that knows anything about this. Keep quiet.' "

the tax authorities, and that the alleged offsetting payments for black-market supplies were in fact concocted "out of thin air" at the July meeting; and (5) Huebner swears that in July and August 1948 he gave Cain $10,000 which Cain said he needed "to fix the tax difficulty we were in." [15] Huebner says in his affidavit that he was not asked to testify in the District Court "because I had stated I would not lie on the stand."

It is obvious that the Government's new evidence casts the darkest shadow upon the truthfulness of the disclosure testimony given by or on behalf of the respondents in the District Court. If true, it indicates that what the respondents have sought to represent in the District Court, the Court of Appeals, and in this Court as a voluntary disclosure, made in a timely manner and in good faith, was instead but a further step in a conspiracy to "fix" Shotwell's tax difficulties, possibly involving the cor-

---

[15] The Solicitor General represents that if the motion to remand is granted Revenue Agent Joseph M. Lima will testify that on July 30, 1948 he was instructed by his Group Supervisor, Ralph Johnson, to make an immediate audit of Shotwell's 1946 return; that thereafter he was instructed by Johnson to allow (as offsets) over-ceiling purchases totaling more than $300,000, which were wholly unsubstantiated and whose allowance was contrary to the existing Revenue Service policy; and that he then prepared a report showing a tax deficiency for 1945 and 1946 of about $20,000, which report he destroyed at Johnson's direction in September 1948, after the Intelligence Unit of the Service had made inquiries about the case. In this connection Huebner states in his affidavit:

"Cain also told me, sometime in about late July, 1948, that he was about to settle the tax case. Shortly thereafter, Cain told me he had settled the tax case for a tax deficiency of $20,000.00.

"In October, 1948, Busby told me that there had been a meeting in the fraud division at the Internal Revenue office and that hell had broken loose; that some Internal Revenue people had a heck of a time destroying papers that had been made up for the purpose of billing Shotwell for taxes."

ruption of government officials,[16] and certainly entailing an attempt to perpetrate a fraud upon the courts. Were we to undertake to review the Court of Appeals upon a record as suspect as this, we might very well be lending ourselves to the consummation of a fraud which may already have made the Court of Appeals its unwitting victim. In these circumstances it is imperative that the case be remanded to the District Court for a full exploration of where the truth lies before the case is allowed to proceed further. The integrity of the judicial process demands no less.

The path to our decision is clearly marked by this Court's actions and pronouncements in two recent cases, *Communist Party* v. *Subversive Activities Control Board*, 351 U. S. 115, and *Mesarosh* v. *United States*, 352 U. S. 1. In each case the Court refused to consider the questions presented for review in the face of a challenge to the integrity of the record based on newly discovered evidence. In *Communist Party* the Court remanded the case to the Board with directions to resolve the charges of taint, and to make a fresh determination on the merits, if taint were found.[17] In *Mesarosh* the Court, believing that the record clearly demonstrated that a key government witness had been wholly discredited, took more drastic action by reversing the convictions of the petitioners and remanding the case to the District Court for a new trial. The basic reason for the Court's action in

[16] See note 15, *supra*.

[17] Section 14 (a) of the Subversive Activities Control Act expressly authorizes courts of appeals to remand cases to the Board for the taking of further evidence. 64 Stat. 987, at 1001–1002. Our authority to act in similar fashion is found in the broad provisions of 28 U. S. C. § 2106, which grants us power, incident to our appellate jurisdiction, to "vacate . . . any judgment" brought "before [us] for review" and to "require such further proceedings to be had as may be just under the circumstances."

both cases was made manifest in its opinions. In *Communist Party, supra,* at pp. 124–125, the Court said:

"The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our proudest boasts. This Court is charged with supervisory functions in relation to proceedings in the federal courts. See *McNabb* v. *United States,* 318 U. S. 332. Therefore, fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted. . . . We cannot pass upon a record containing such challenged testimony. We find it necessary to dispose of the case on the grounds we do, not in order to avoid a constitutional adjudication but because the fair administration of justice requires it."

In *Mesarosh, supra,* at p. 14, the Court said:

"This is a federal criminal case, and this Court has supervisory jurisdiction over the proceedings of the federal courts. [Citing *McNabb, supra,* in a footnote.] If it has any duty to perform in this regard, it is to see that the waters of justice are not polluted. Pollution having taken place here, the condition should be remedied at the earliest opportunity."

A convincing showing is of course necessary to bring these principles into play. We think that such a showing has been made here. The newly discovered evidence contained in the affidavits from the prospective witnesses Graflund and Huebner cuts to the very heart of the testimony adduced by respondents to show that they made a timely and bona fide disclosure to the Treasury, the sole issue involved in the suppression hearings and the issue on which the outcome of the case in the Court of Appeals turned. It is plain that either the testimony in the Dis-

trict Court was untrue or these affidavits themselves are the product of fraud. This is a matter for the District Court to determine. One thing is clear. This Court cannot be asked to review the decision of the Court of Appeals until these charges have been resolved.

In both the *Communist Party* and *Mesarosh* cases, *supra,* the action of the Court enured to the benefit of the defendants. In this instance the further proceedings below may work to the advantage of the Government.[18] In the circumstances of this case we think that the distinction makes no difference. Because they were found guilty by the jury, respondents concede, as they must, that the motion to remand involves no question of double jeopardy. See *United States* v. *Ball,* 163 U. S. 662, 672. Their objection that it is "unfair" to allow the Government at this stage of the proceedings to "bolster" the record relating to the suppression issue is likewise unacceptable. It is undeniable, of course, that upon appellate reversal of a conviction the Government is not limited at a new trial to the evidence presented at the first trial, but is free to strengthen its case in any way it can by the introduction of new evidence. We think that in the peculiar circumstances of this case the fair administration of justice requires that the Government should have a similar opportunity here. For if the Government's evidence is found to be true, it would then appear that the Court of Appeals' decision setting aside the verdict was obtained by the respondents on a corrupt record attributable to their own fraud. In the further proceedings in the District Court the respondents will of course have a reciprocal opportunity to sustain the validity of their asserted voluntary disclosures.

---

[18] The Government does not concede the correctness of the Court of Appeals' decision upon the existing record. Cf. *United States* v. *Johnson,* 327 U. S. 106, 111, 112.

We should not lose sight of the fact that the Government's new showing does not relate to an issue submitted to the jury in the proceedings below, but rather to a preliminary question as to the admissibility of evidence.[19] Hence, to grant the Government's motion is not to permit it to "bolster" the evidence upon which the verdict of guilty was returned by the jury in this case. That verdict clearly must stand or fall on the sufficiency of the evidence already introduced at the trial.

In these circumstances, acceptance of the respondents' position on this motion would be tantamount to sanctioning a rule which would prohibit appellate review upon a record suspect of taint, if the taint might operate to the disadvantage of the defendants, but which would nevertheless require review if the taint might operate to their advantage. We cannot subscribe to that quixotic result. The fair administration of justice is not such a one-way street.

The respondents contend that the motion to remand should originally have been addressed to the Court of Appeals, and that we should now send the Government back to that court.[20] This contention is essentially one

---

[19] Respondents did not urge below, nor do they suggest here, that the question of admissibility of the disputed evidence was properly an issue for the jury. Rather their contention has been that the *judge* should have sustained the motion to suppress.

[20] It has also been suggested that these charges of fraud could be dealt with at the new trial which the Court of Appeals has ordered. But as the Court of Appeals has directed suppression of the evidence obtained by the Government as a result of the alleged voluntary disclosure, it seems clear that at the new trial the Government could not use that evidence, or the fruits thereof, unless the "suppression" aspect of the judgment of the Court of Appeals is vacated. We think that the sound administration of justice precludes that course because, if the Government's evidence is true, the net effect would be to grant the respondents a new trial, not otherwise justified, procured by their own fraud.

addressed to our discretion, and in the circumstances of this case we find it unavailing. The Government was not in a position to make the motion until after its petition for certiorari had been filed in this Court. The course of this litigation has already been protracted. We are abundantly satisfied that the charges as to the integrity of the record must be fully aired, and that the proper forum for this is the District Court because of its intimate familiarity with the record and its facilities for sifting controverted facts. In this state of affairs we think that it would be both unnecessary and wasteful to remit the Government to the Court of Appeals. Cf. *Mesarosh, supra,* at p. 13.

We conclude with a word about the nature of the further proceedings in the District Court. The additional evidence to be presented by both sides will be confined to the suppression issue. The District Court will make such new findings of fact on this issue as may be appropriate in light of the further evidence and the entire existing record (see *Carroll* v. *United States,* 267 U. S. 132, 162), including findings on the question of the timeliness of respondents' alleged disclosures.[21] If the District Court decides, on the basis of its new findings, to

---

[21] Respondents have contended that the Government's new evidence is irrelevant to the issue of timeliness because, even assuming its truth, the disclosure was timely since no formal investigation was initiated by the Revenue Service until after July 1948, the time that the Government's new evidence indicates that the respondents first communicated with the Treasury. We find it unnecessary to deal with this contention because the new evidence is in any event clearly relevant to the question whether a bona fide disclosure was in fact ever made. Moreover, in the present state of the record this Court should not pass on respondents' argument as to timeliness because (a) the District Court has not yet made a finding on this issue, and (b) the Treasury "voluntary disclosure policy" was never formulated with sufficient precision to enable us to apply it mechanically.

adhere to its original decision on the motion to suppress, it will then enter new final judgments based upon the record as supplemented by its new findings, thereby preserving to all parties the right to seek further appellate review, including respondents' right to have reviewed by the Court of Appeals alleged errors in the original trial which that court did not reach in the previous appeal. If, on the other hand, the District Court concludes after the further proceedings that the motion to suppress should have been granted, it would then become its duty to accord the respondents a new trial.

In accordance with the views set forth in this opinion, we make the following disposition of this case: (1) this Court's order of February 25, 1957, which granted with limitations the Government's petition for certiorari, is vacated and such petition is granted without restriction; (2) the judgment of the Court of Appeals is vacated; and (3) the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

Dissenting opinion of MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS concur, announced by MR. JUSTICE DOUGLAS.

By remanding this case so that the Government can introduce additional evidence to save the conviction thrown out by the Court of Appeals, I think the Court takes unnecessary and unprecedented action which may have far-reaching and unfortunate ramifications not yet clearly foreseen. I would deny certiorari and thus permit the case in its regular course to go back to the District Court for a new trial pursuant to the decision of the Court of Appeals. At this trial the Government could introduce any evidence which it now has, new or otherwise, and a full hearing could be had on its charges of perjury and fraud.

The Court of Appeals held that defendants' incriminating disclosures were secured by promises of immunity made by various government officials and that such disclosures could not be used to convict defendants because of their privilege against self-incrimination under the Fifth Amendment. Now this Court sends the case back to the District Court to hear new evidence and make new findings with respect to whether defendants' disclosures were made in good faith and in full accordance with certain vague conditions attached to the offers of immunity.[1] The majority asserts that it is not ruling on the merits of the defendants' Fifth Amendment claims but it seems to me a vain and wasteful act for the majority to return the case to the District Court for these supplemental proceedings unless it assumes that neither the Fifth Amendment nor any rule of evidence in the federal courts bars the use of incriminating admissions induced by promises of immunity where the disclosures are not made with pure motives. If we are going to concern ourselves with the case at all, I believe we should at least give full consideration to the legal problems involved in defendants' requests for suppression before remanding the case for any further proceedings.

I think the Fifth Amendment questions raised here are important, unsettled and not susceptible to offhand resolution, particularly with respect to incriminating evidence which the defendants actually turned over to the Government in hope of securing immunity from prosecution. In *Bram* v. *United States,* 168 U. S. 532, 542–543, the Court referred with approval to the rule that

"'. . . a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted

---

[1] "We are not concerned with the motivating force behind an individual's deciding to come in and talk to us about his evasion. If he 'gets religion' before we have done anything, he will not be prosecuted." Treasury Press Release, May 14, 1947.

> by any sort of threats or violence, *nor obtained by any direct or implied promises, however slight,* nor by the exertion of any improper influence. . . . A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted.' " (Emphasis supplied.)

In accord with this statement it appears to have been generally assumed in this Court that the Fifth Amendment bars the use against a defendant in a criminal prosecution of confessions or admissions secured from him by promises of immunity. See, *e. g., Hardy* v. *United States,* 186 U. S. 224, 229; *Ziang Sung Wan* v. *United States,* 266 U. S. 1, 14; *Smith* v. *United States,* 348 U. S. 147, 150. And so far as I can tell this Court has never considered whether lack of good faith deprives a suspect of the Fifth Amendment's protection when he makes disclosures under a promise of immunity, or under just what circumstances and to what extent this might be true. I do not mean to intimate any view on the merits of this problem now, but I do register a protest against the manner in which the majority disposes of the case.

I believe the majority has also disregarded another significant and crucial consideration—the role of the jury in passing on the admissibility of defendants' disclosures. In *Wilson* v. *United States,* 162 U. S. 613, 624, the Court laid down a rule which it has never questioned:

> "When there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decides that it is admissible, the question may be left to the jury with the direction that they should reject the confession if upon the whole evidence they are satisfied it was not the voluntary act of the defendant."

Just recently in *Smith* v. *United States,* 348 U. S. 147, 151, the Court stated that the question of voluntariness was properly left to the jury where a taxpayer claimed he had made certain disclosures on the strength of promises of immunity by revenue officers. Cf. *Kent* v. *Porto Rico,* 207 U. S. 113, 118–119.

In the lower federal courts there seems to be considerable difference of opinion as to whether the *Wilson* case makes it mandatory that the jury participate in the process of determining whether a confession is voluntary or whether the jury's participation is a matter of discretion with the trial judge.[2] *E. g.,* compare *United States* v. *Leviton,* 193 F. 2d 848, 852, cert. denied, 343 U. S. 946, with *Lewis* v. *United States,* 74 F. 2d 173, 178–179. In at least the District of Columbia Circuit the rule appears to be settled that the trial judge must submit the question of voluntariness to the jury for its independent determination. *McAffee* v. *United States,* 70 App. D. C. 142, 105 F. 2d 21. In the States a number of different methods of allocating the burden of determining the voluntariness of a confession between the judge and jury have been followed, but the trend seems to be that the judge should determine voluntariness in the first instance and if he finds that the confession is voluntary then should submit the case to the jury with instructions not to consider the confession as evidence unless they also find it voluntary. As a matter of fact the Court in *Wilson* relied on state cases which had laid down this so-called "humane" rule. I myself favor such a rule, which is particularly beneficial where, as here, the question of admissibility turns to a large extent on the credibility of witnesses.

I think that the principles established in *Wilson* and subsequent cases clearly apply to the questions of admis-

[2] The entire subject is annotated in great detail at 170 A. L. R. 567. Also see 85 A. L. R. 870.

sibility raised in this case.  Under these principles the trial judge, at a minimum, has the option of submitting such questions to the jury.  But the majority's disposition of this case precludes that possibility at the partial new trial which it orders.  It attempts to avoid this infirmity by saying, "the Government's new showing does not relate to an issue submitted to the jury in the proceedings below, but rather to a preliminary question as to the admissibility of evidence."  And it continues, "Respondents did not urge below, nor do they suggest here, that the question of admissibility of the disputed evidence was properly an issue for the jury."  But these answers are obviously inadequate.  We are not concerned with what has happened or what was urged but with how this case will be handled in the future.  If the new trial ordered by the Court of Appeals had been allowed to stand the defendants would not have been barred from demanding that the question of admissibility be submitted to the jury just because they had not made a similar request at the first trial or on appeal.

The Court now gives the Government an opportunity to introduce new evidence in an attempt to save a conviction it has lost in the Court of Appeals.  If this does not technically infringe the protection against double jeopardy it seems to me to violate its spirit.  Cf. *Green* v. *United States,* 355 U. S. 184; *Kepner* v. *United States,* 195 U. S. 100, 128–129.  In fact it is even worse in some respects.  Only the Government stands to benefit from this partial new trial while the defendants must fight to keep what they already have.  Not a single case has been referred to or discovered where defendants have been subjected to such piecemeal prosecution.[3]  To my knowledge

---

[3] Neither *Mesarosh* v. *United States,* 352 U. S. 1, nor *Communist Party* v. *Subversive Activities Control Bd.,* 351 U. S. 115, serves as any authority for the Court's action.  In the *Mesarosh* case the Government had secured a conviction which had been upheld by the

it is a new idea that the Government can supplement a trial record in order to retain a conviction which an appellate court would otherwise reverse.

Both the Government and the Court concede that the action taken here is extraordinary but such disposition is justified on the ground that this is an exceptional case which called for extraordinary action. I do not agree. In essence all the Government proposes to do on remand is to impeach the testimony of certain witnesses for both sides with alleged newly discovered evidence. No witness has recanted nor do the defendants concede that their testimony was false. If the Government can partially reopen a case to impeach witnesses what rational basis is there for denying it a similar right in any case when new facts appear which persuasively suggest that it could strengthen its evidence in order to save a conviction on appeal? This possibility emphasizes the anomalous nature of what is done here.

The Court proceeds on the assumption that it would be improper for us to review the suppression question on a record which might contain materially false testimony

---

Court of Appeals. In this Court the Government came forward with evidence that one of its principal witnesses at the trial had committed perjury and the Court reversed the conviction and remanded the case for a full new trial. Here the United States has lost a conviction in the Court of Appeals. It now asks us to send the case back to the trial court so that it can introduce additional evidence in an attempt to salvage the reversed conviction. The difference between the two cases is manifest and crucial.

In the *Communist Party* case administrative findings were challenged and this Court remanded the case to the agency so that it might consider the record free of any perjurious testimony by government witnesses. The administrative proceeding there can hardly be equated with the criminal prosecution involved here. Moreover, in both the *Mesarosh* and *Communist Party* cases the Court's action operated to protect the rights of defendants, not as here to aid the Government. In view of our traditional methods of criminal justice this difference is not without importance.

and that it is better, although concededly unique, to send the case back for more evidence on that issue. But there is no need to resort to either undesirable alternative. As I stated in the beginning the case should simply be left alone and allowed to go back for a new trial. There the Government can offer all the evidence it has or can secure so that a new record can be made on the suppression issue. In my judgment it cannot seriously be contended that the Government would be barred from introducing evidence on that issue at a new trial. While it is true that the Court of Appeals ordered the disclosures suppressed, on the evidence in the record then before it, such ruling should not be construed as binding at a new trial where substantial newly discovered evidence is available. Cf. *Aetna Life Ins. Co.* v. *Wharton,* 63 F. 2d 378; *City of Sedalia ex rel. Ferguson* v. *Shell Petroleum Corp.,* 81 F. 2d 193. If need be—and I think not—this Court could vacate the judgment of the Court of Appeals to the extent necessary to allow the Government a *de novo* hearing on the suppression issue at the new trial. 28 U. S. C. § 2106. This would do full justice as far as the charges of tax evasion are concerned and if perjury has been committed it can be prosecuted as a separate crime.

I think this case is a dangerous precedent which should not be launched needlessly into the stream of the law.