MASSACHUSETTS BAY TELECAST-
ERS, Inc., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,
WHDH, Inc., Intervenor.

GREATER BOSTON TELEVISION COR-
PORATION, Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,
WHDH, Inc., Intervenor.

Nos. 13896, 13899.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 12, 1957.

Decided July 31, 1958.

Petition for Rehearing Denied
Sept. 12, 1958.

Mr. Henry E. Foley, Boston, Mass., of the bar of the Supreme Judicial Court of Massachusetts, *pro hac vice*, by special leave of Court, with whom Messrs. James A. McKenna, Jr., and David S. Stevens, Washington, D. C., were on the brief, for appellant in No. 13,896. Messrs. Vernon L. Wilkinson, Washington, D. C., and Laurence S. Fordham, Boston, Mass., also entered appearances for appellant in No. 13,896.

Mr. J. Joseph Maloney, Jr., Boston, Mass., with whom Messrs. Jeremiah T. Riley, Washington, D. C., and Richard Maguire, Boston, Mass., were on the brief, for appellant in No. 13,899.

Mr. Richard A. Solomon, Asst. General Counsel, Federal Communications Commission, with whom Messrs. Warren E. Baker, General Counsel, Federal Communications Commission, and Charles C. McCarter, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. William J. Dempsey, Washington, D. C., with whom Messrs. William C. Koplovitz and Harry J. Ockershausen, Washington, D. C., were on the brief, for intervenor.

Before EDGERTON, Chief Judge, and DANAHER and BURGER, Circuit Judges.

DANAHER, Circuit Judge.

The Federal Communications Commission, by its decision released on April 25, 1957, awarded VHF Channel 5 in Boston

to WHDH, Inc. (WHDH), intervenor herein. This corporation had been acquired by the Herald-Traveler Corporation in 1946. WHDH, AM and FM licensee, had in 1947 applied for television facilities. Substantial studies and surveys were undertaken to determine community needs. It commenced closed circuit operations and the training of members of its engineering department. It established community development programs in consultation with civic leaders, and since 1948 had cooperated with the Boston Herald-Traveler in experimental local and regional motion picture news coverage for television. Against such background as found by the Commission, and after extensive comparative hearing, WHDH was selected as the "best qualified to bring a service to the public from the standpoint of the operation proposed, the assurance of effectuation of such proposal, and assurance of a continuing awareness of community needs and the meeting of such needs."

Two corporations formed for the purpose of seeking an award of Channel 5, Greater Boston Television Corporation, Inc. (Greater Boston) and Massachusetts Bay Telecasters, Inc. (MBT), have appealed. There had been six applicants [1] whose mutually exclusive applications had been consolidated by the Commission's order of June 16, 1954, for hearings with respect to significant differences as to:

"(a) The background and experience of each of the * * * applicants having a bearing on its ability to own and operate the proposed television station;

"(b) The proposals of each of the * * * applicants with respect to the management and operation of the proposed station; and

"(c) The programming service proposed in each of the * * * applications."

Some 13 factors were explored, including local residence, the degree of civic participation and diversification of occupations of the principals, and their experience. The inquiry treated of integration of ownership with management and past broadcast records. Planning and preparation, program policies and proposals, studios and equipment and staff to be employed were gone into. The Commission's policy as to diversification of control of media of mass communications had loomed large in the mind of the Hearing Examiner [2] whose views as to the importance of the factor were not followed by the Commission. Again the Examiner was overruled when the Commission refused to accept his condonation of non-disclosure by one of Greater Boston's most important figures who was found knowingly to have concealed his earlier disbarment as a lawyer and his conduct thereafter under an assumed name. It is clear the Commission felt substantial demerit attached to Greater Boston on that account.

Various "preferences" based upon such factors were found in favor of one applicant or another as the Commission evaluated the record.[3] Each of the three par-

1. The application of Columbia Broadcasting System, Inc., at its own request, was dismissed prior to hearing. The Post Publishing Company withdrew before the Commission decided the case. The application of Allen B. DuMont Laboratories, Inc. (DuMont) was denied in the Commission's final decision, but DuMont has brought no appeal to this court. DuMont's showing on "local factors" was "weak," the Commission concluded.

2. The Examiner eliminated WHDH because of his interpretation of the Commission's policy concerning concentration of control of media for the dissemination of news and views within the same area. See discussion in Part IV

infra. He also considered significant the failure of WHDH to give assurance of a national network affiliation. But see F.C.C. v. Allentown Broadcasting Corp., 1955, 349 U.S. 358, 363, 364, 75 S.Ct. 855, 99 L.Ed. 1147.

3. Our Joint Appendix runs through nearly 900 printed pages. Twenty-two vast volumes of transcript and exhibits had been aggregated during the hearings which were concluded on February 4, 1955, after which the various applicants submitted proposed findings. The Hearing Examiner's Initial Decision was issued on January 4, 1956, following which exceptions were filed, and oral argument was had before the Commission on Oc-

ties before us prevailed in one or more respects over the other two. The cumulative total weight of the Commission's appraisal of all factors, it said in effect, impelled its award to WHDH.[4]

## I

Both Greater Boston and MBT charge error as to certain rulings by the Hearing Examiner and thereafter by the Commission.

MBT had sought the introduction in rebuttal of certain exhibits designed to illuminate deficiencies in the proposals of its adversaries as to studios, equipment and staffing. As to such deficiencies the Examiner had also refused to hear the opinions of proffered witnesses. As the Commission sustained its Examiner, it observed that in last analysis, it is the Commission itself which must determine the adequacy of the pending proposals and the significance of inadequacies, if any, which might be developed.

Greater Boston charged the Commission had erred in upholding its Hearing Examiner's refusal to receive in evidence certain employment contracts. These instruments had contained stock options in favor of certain proposed key employees, and Greater Boston claimed the evidence was material in support of its showing on the issue of integration of ownership with management. Greater Boston in its amended application of May 3, 1954, had noted that stock options had been granted to "three prospective employees." The parties stipulated that no improvement should be made with respect to the case of any applicant on and after July 1, 1954. Some months later, when the direct cases of the parties were exchanged, Greater Boston for the first time undertook to identify the "employees." Upon objection that the proffer constituted a variance from the application, the contracts were rejected. With the record before it showing, however, that the employees were later extensively cross-examined and that their proposed status was thus developed, the Commission concluded that the Examiner had ruled correctly. It decided that Greater Boston would have been given an unfair competitive advantage, and that the Examiner had properly exercised his discretion.

■ We have weighed the effect of these challenged rulings and are persuaded that the Commission did not err. The Commission's rule, 47 C.F.R. 1.365, makes provision for amendment to an application, already designated for hearing, by formal petition with service on other parties, which, for good cause shown, may be granted. The Commission acted within its prerogative where Greater Boston had not shown compliance with the requirements of the rule. The Commission found that no applicant had proposed a type of integration of ownership with management which could be called substantial in nature. Quite apart from the basis upon which the Commission's ruling permissibly was rested, it is clear that Greater Boston on the integration issue was deemed to have been adversely affected because of the demerit attaching to the disqualification of its proposed general manager who had played so important a part in the preparation of Greater Boston's amended application and with the presentation of its case.

The Commission found that no one of the applicants was entitled to a preference with respect to the program proposals. It considered that the contentions as to studios and equipment proposals were of no materiality to the

---

tober 29, 1956. We mention these dates for later reference purposes.

4. Commissioners McConnaughey, Doerfer, Lee and Mack voted for the award. Commissioner Craven abstained from voting. Commissioner Hyde dissented saying he would have selected an applicant offering a "higher degree of diversification." Commissioner Bartley shared that view and also would have weighed adversely the past record of use by WHDH of its radio station as an adjunct of its newspapers. The dissenting statements of the latter may be found in 13 Pike & Fischer Radio Reg. 587 and 588.

ultimate decision. It found that the personnel selected by each applicant had been disclosed to be fully qualified to perform the duties for which each had been selected, and that the staff proposal of each applicant was entirely adequate to effectuate its planned operation.

The Commission concluded, irrespective of the foregoing, that each of the applicants possessed the qualifications to operate a station in the public interest,[5] so that the rulings complained of lapse into insignificance in any event. We find no prejudicial error.

## II

Both Greater Boston and MBT attack the Commission's refusal to reopen the record to receive newly discovered evidence of alleged antitrust violations on the part of WHDH, including alleged threats by its publisher, one Choate, to use Channel 5 to drive the Boston Globe out of business. We summarize details as to the Boston Globe issue.

Nearly two years after the hearing record had been closed, and more than one year after the Hearing Examiner had issued his Initial Decision *favorable to Greater Boston,* the Globe Newspaper Company, publisher of the Boston Globe, sought on January 30, 1957, to intervene. The Globe asserted an interest as a direct competitor of the Boston Herald-Traveler Corporation, owner of WHDH. Allegedly, Herald-Traveler's representative Choate, during 1955 and 1956, had urged a merger of the Traveler publications with the Globe papers, and had sought to upset the Globe's financing of its projected new plant. In an affidavit by the Globe's treasurer, one John I. Taylor, it was further charged that on January 31, 1956, Choate had threatened "Of course if I get Channel 5 I may drive you out of business." An affidavit by one Reid charged Choate with saying on March 10, 1956, "Wait until we get our TV station and see what happens." Upon what basis Choate could possibly then have supposed

WHDH might ultimately prevail does not appear.

Choate's answering deposition alleged that merger discussions had intermittently occurred over a period of some ten years. He denied allegations of "threats," particularly emphasizing that the Examiner only 27 days earlier than the date of the first threat had already recommended the award be made to Greater Boston—not to WHDH. "I am sure I would have been laughed out of the room," he deposed. He noted that the Taylor affidavit had been executed before one Leahy as notary public, but that Leahy was also a "member of the Board of Directors of the Globe Newspaper Company, attorney for that company, and a stockholder of the Greater Boston Television Corporation, an applicant in these proceedings, who has given testimony in these proceedings." We need not go into detail as to other supporting as well as challenging affidavits. Nor need we particularize as to inferences, permissibly to be drawn by the Commission, for brief references hereinafter will suffice.

Whatever basis may have existed for concern on the part of the Globe's officers, they did nothing throughout 1956 following the Examiner's recommendation favorable to Greater Boston. Not until three months after oral argument had been heard by the Commission on October 29, 1956, was any step taken by the Globe's officers.

The Commission, one member not voting, unanimously denied the Globe's petition since it was untimely and could have been filed well before oral argument had been had. Without actually finding lack of good faith on Globe's part, the Commission recited from the reply of WHDH that Greater Boston's attorney shared offices with the Globe's attorney who could have known "actually, as well as constructively" the status of the proceeding. WHDH had charged also in opposition that the attempted intervention "was

5. Scripps-Howard Radio v. Federal Communications Comm., 1951, 89 U.S.App. D.C. 13, 189 F.2d 677, certiorari denied 1951, 342 U.S. 830, 72 S.Ct. 55, 96 L. Ed. 628.

a calculated design to achieve longer protection against television operation in Boston by waiting until the last minutes to file its petition," the Commission noted.

On February 13, 1957, Greater Boston, on the basis of the Globe's allegations, sought to reopen the record. Contemporaneously MBT acted likewise, but asked consideration of the subject matter *only* in the event the award was to be made to WHDH. The Commission observed in its memorandum and order denying their motions to reopen, that the final decision had been under consideration since the oral argument on October 29, 1956.[6] Just when the Commission's decision was *actually* reached, we do not know, but it is obvious that protracted diligence must have been required to prepare the Commission's final opinion which occupies 173 printed pages in the Joint Appendix.[7] The decision was released on April 25, 1957.

At the same time, the Commission denied the Globe's petition and those of Greater Boston and MBT to reopen the record. The latter charge error in that denial, but we do not agree. The Examiner had conducted extended inquiry into the operations of the Herald-Traveler in relation to its AM broadcasting. The belated allegations might properly be weighed against what had happened in the past course followed in the operation of WHDH, and with the actual *record* thus viewed, the *claimed* effect might have seemed far short of the assertions put forth by the proponents. The additional "facts" alleged might be deemed to have been countered by the proof.

To illustrate, the exhibits filed by WHDH in opposition to the reopening show the Globe over the same period advertising itself as "New England's Fastest Growing Newspaper" with 1956 gains over 1955 of 93,657 in its daily circulation and 63,457 for its Sunday editions, with 1956 gains of 3,508,558 lines in total advertising, which were claimed to be "nearly twice as much in total advertising as the two other Boston newspapers COMBINED."

The Commission failed to find in the record evidence "of a course of action by WHDH designed in any way to injure the Globe or any other newspaper or broadcast station, or which disserved the public interest." It saw nothing in the "threats" which, if made, were not shown to have materialized either as against the Globe's procurement of the loans it had sought or as to its expansion in the publications field. "In the circumstances, and considering the length of time which this proceeding spans, offering ample opportunity to call to our attention such matters, if they exist; considering further the laches involved on the part of the Globe in filing the present petition; and considering as well the full opportunity of inquiry afforded during the hearing itself, the Commission declines to reopen this record or permit the intervention requested."[8]

In view of the mass of evidence already in the record and the Commission's conclusion that no adequate justification for reopening had been shown, the Commission denied the petitions in the interests of administrative finality. We are persuaded that it has not been shown to have abused its discretion.

### III

As we cut through to the heart of this controversy, both appellants basically at-

---

**6.** It is not shown on our record that word of the Commission's ultimate decision to award Channel 5 to WHDH had "leaked," but as will be shown, infra Part VI, before the award was formally made, certain interested persons had some conversations with at least one member of the Commission. See note 31 infra and related text.

**7.** The Commission's opinion appears in 13 Pike & Fischer Radio Reg. 507–587.

**8.** 15 Pike & Fischer Radio Reg. 167, 173. Cf. Kentucky Broadcasting Corp. v. Federal Communications Comm., 1949, 84 U.S.App.D.C. 383, 174 F.2d 38; Colorado Radio Corp. v. Federal Communications Comm., 1941, 73 App.D.C. 225, 229, 118 F.2d 24, 28.

tack the award as arbitrary, capricious and lacking support in the record. MBT particularizes that the Commission had failed to accord to it sufficient weight in those areas of preference where its superiority is said to have been shown.[9] Greater Boston insists that the decision could not have been based on an impartial and rational consideration of the record. The decision is denounced in its brief as "intellectually dishonest," "a travesty of justice" and replete with "essential dishonesty." The Commission thus is substituted as a common target of those parties whose acrimony had previously been spent upon each other.[10]

To illustrate, MBT charged that Greater Boston proposed as its general manager a disbarred lawyer who had first denied under oath but had later admitted the fact of disbarment. Brought out also was the possibly more important item that he had concealed his status and had failed to disclose he had conducted his later business life under another name. Still the Hearing Examiner concluded that the proposed managerial staff of Greater Boston was to be preferred over that of MBT. He felt that this individual might be relied upon in view of the record of his performance over the past fifteen years. On this last account, the Commission said, the Examiner "dismissed the matter as of no importance."

The Commission, as is its right, evaluated the facts much differently. Noting that in performance of its regulatory functions, it must rely upon full and frank disclosure by its licensees, the Commission insisted upon "complete candor on their part." It found that the individual in question had not disclosed he once had been a lawyer and that other Greater Boston stockholders were not shown to have been informed he had later been doing business under an assumed name. Since the individual had assumed a major part in the presentation of Greater Boston's application and would have a prominent role in its proposed operations, the Commission's discredit of this proposed general manager led to comparative demerit to Greater Boston's application. That such misrepresentation and concealment of important and relevant information should be received and should be given substantial weight, we have no doubt.

Greater Boston on the other hand sought from the Examiner's findings that MBT's proposed vice president in charge of sales, one Forrester Clark, had on three separate occasions been criticized by Congressional committees "for his business ethics, or lack of them." It was further sought to have the record show that MBT's president had been a sponsor of and contributor to "questionable" groups, that he had been a member of an organization on the Attorney General's proscribed list and "was a particularly evasive witness." Other figures in the MBT structure would have been denounced by innuendo.[11] The Commission discounted all such items.

Nor were personages in WHDH immune. "The Herald-Traveler is owned

9. But see Scripps-Howard Radio v. Federal Communications Comm., supra note 5, and cases cited.

10. Certainly discrediting evidence may have the effect of destroying the eligibility of an adversary without enhancing the status of the party offering it. Without a more solid predicate than mere survival, the Commission would not be justified in concluding that the least wounded becomes inevitably in the public interest the most competent to operate an important television property. Of course even innocent stockholders may suffer when there has been deception or deliberate falsity in the furnishing of

required information. The effect upon the corporation's qualification to serve the public interest is for the Commission to decide. That Greater Boston suffered here is not beyond understanding. Cf. Federal Communications Comm. v. WOKO, Inc., 1946, 329 U.S. 223, 227, 229, 67 S.Ct. 213, 91 L.Ed. 204.

11. The biographies of many of the key personnel associated with *each* of the applicants demonstrate on the record highly creditable achievements in various important and widely diversified walks of life. Some of the figures indeed are outstanding in their fields and are nationally known and respected.

and run by men who have been found to be in violation of the antitrust laws in their other business [sic]," Greater Boston tells us in its brief. The Chairman of the Board of United Shoe Corporation, one Winslow, is also president of the Boston Herald-Traveler Corporation. The Commission points to United States v. United Shoe Machinery Corp., D.C., 110 F.Supp. 295 where, at page 345 the court observed that "United's power does not rest on predatory practices. Probably few monopolies could produce a record so free from any taint of that kind of wrongdoing. The violation with which United is now charged depends not on moral considerations, but on solely economic considerations." At page 348 the court observed that the Supreme Court had three times, in effect, not only not condemned what United was doing but "one ought to go further and say they were in part endorsed. In the face of these decisions, it would be anomalous to charge the officers of United with any moral deficiency." The Supreme Court of the United States "being satisfied that the findings are justified by the evidence" affirmed. United Shoe Machinery Corp. v. United States, 1954, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910.[12]

It may be gathered that the comparative hearing presented a veritable welter of controversy. Perhaps it is not without significance that neither the Hearing Examiner nor any member of the Commission acted in favor of an award to MBT. The Examiner had recommended Greater Boston, as noted, after eliminating WHDH for reasons previously stated.[13] The Commission ruled in favor of WHDH because of its "overall strength." It concluded that the "local factors, the program proposals, and the assurance of effectuation which is gathered from its superior broadcasting record over a peri-

od of years in the community concerned and the experience qualifications which its principals demonstrate" were persuasive. Thus it found that WHDH "is the most qualified to provide programming service on a continuing basis in the interests of the population of the coverage area, notwithstanding that the diversification policy of the Commission would be better served by a grant to either Greater Boston or MBT. We believe that from the demonstrated superiority of the service to be expected from WHDH, greater public benefit would flow than would come from the application of our diversification policy in order to effect a grant to one of its competitors." [14]

"The controversy is in an area into which the courts are seldom justified in intruding. The selection of an awardee from among several qualified applicants is basically a matter of judgment, often difficult and delicate, entrusted by the Congress to the administrative agency. The decisive factors in comparable selections may well vary; sometimes one applicant is superior to another in one respect, whereas in another case one applicant may be superior to its rivals in another feature. And it is also true that the Commission's view of what is best in the public interest may change from time to time. Commissions themselves change, underlying philosophies differ, and experience often dictates changes. Two diametrically opposite schools of thought in respect to the public welfare may both be rational * * *. All such matters are for the Congress and the executive and their agencies. They are political, in the high sense of that abused term. They are not for the judiciary." [15]

12. The Commission took note that Allen B. DuMont Laboratories, Inc. was defendant in three civil proceedings brought by appliance dealers who had alleged that DuMont's business practices violated the antitrust laws. "No judgment has been entered, nor are any facts shown * * * which would warrant an adverse finding against DuMont in this regard."

13. See note 2 supra.

14. 13 Pike & Fischer Radio Reg. at 587, and see 555–557.

15. Pinellas Broadcasting Co. v. Federal Communications Comm., 1956, 97 U.S.

■ It would unduly prolong an already far extended discussion were we now to narrate the findings of the Commission with reference to the planning and preparation for television by WHDH,[16] and details as to its broadcasting record over previous years.[17] That the Commission might properly accord great weight to such history seems clear.

## IV

■ It remains only for us to consider the diversification issue. It certainly is so that the owner of a newspaper is not, simply on that account, disqualified as a radio or television licensee.[18] The effect of such ownership and control and the weight to be given to the factor will turn on many circumstances, but the local setting in each case offers a guide. Concentration in some situations may be utterly controlling so far as the public interest is involved. See, for example, Mansfield Journal Co. v. Federal Communications Comm.,[19] where a license was denied, not because the applicant published a newspaper but because it utilized its sole newspaper status in the community to achieve a monopoly in advertising and news dissemination.

In the instant case the Commission found that the Boston metropolitan area, including some 65 cities and towns,[20] had a population of 2,369,986. The city itself is a principal trading center for New England, ranking high in addition as a cultural center, with some 62 institutions of higher learning. The Commission noted that there were at the time of its decision, 8 daily newspapers published in Boston, although the Post had discontinued publication. In addition to the contested Channel 5 there were 3 VHF channels in Boston. Three UHF channels had been allocated to the area. WHDH was only one of 17 AM broadcasting stations and was one of 10 FM stations. The Commission noted that while the Boston Herald and the Boston Traveler newspapers are conducted as a joint enterprise for purposes of accounting, purchasing and sales, each has its own managing editor and each takes a different editorial position. That both are in avid competition with the Morning Globe and the Evening Globe, just as is the Sunday Herald with the Sunday Globe, has been clearly established.

The Examiner in considering this aspect of the problem in effect decided that WHDH was disqualified, and thus he eliminated WHDH, largely in reliance upon the Commission's position as he interpreted its application in Radio Wisconsin, Incorporated.[21] The Commission, however, distinguished that case, pointing out that both applicants there possessed not dissimilar diversification aspects, that both were closely matched in other areas of comparison, and that the

---

App.D.C. 236, 238, 230 F.2d 204, 206, certiorari denied 1956, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869; McClatchy Broadcasting Co. v. Federal Communications Comm., 1956, 99 U.S.App.D.C. 195 and 199, 239 F.2d 15 and 19, certiorari denied as to both Sacramento Telecasters, Inc., v. McClatchy Broadcasting Co., 1957, 353 U.S. 918, 77 S.Ct. 662, 1 L.Ed.2d 665; Scripps-Howard Radio v. Federal Communications Comm., supra note 5.

16. But see 13 Pike & Fischer Radio Reg. at 555 et seq.

17. Id. at 519, 525-26, 555-57.

18. McClatchy Broadcasting Co. v. Federal Communications Comm., supra note 15.

19. 1950, 86 U.S.App.D.C. 102, 180 F.2d 28. Compare in this same case the status of

Lorain Journal and the various aspects of its monopoly position considered in Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162.

20. New Bedford, Fall River, Providence, Springfield, Worcester, Lowell, Nashua, Concord and many other substantial centers ringing the Boston metropolitan area, present local spheres of influence of press and radio media. Certainly neither the Herald nor the Traveler is shown to possess a dominant position over any competitor either in the city of Boston or the Greater Boston area. Cf. Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277.

21. 10 Pike & Fischer Radio Reg. 1224.

position of Badger Television Company in terms of its localization had been sufficient to control the award to Radio Wisconsin. It explained here that the statements in its earlier opinion relative to diversification must be read in comparative context, but always to the end that diversification of the media of mass communications must receive consideration as a comparative factor. The Commission's instant opinion recalled that it "has never * * * stated that an applicant which has suffered a loss of preference on the grounds of diversification is to be disqualified." It was pointed out:

> "Indeed in representations from time to time over a period of years to the Congress which has sought its views, inter alia, upon proposed legislation precluding discrimination against newspaper interests applying for broadcast licenses, the Commission has firmly stated that such legislation was and is unnecessary because the Commission has not discriminated against such applicants, has no intention to do so, and has rather given comparative weight in a given proceeding, on a case by case approach, to such facts as are presented with respect to diversification elements such as newspaper interests, theater interests, broadcast interests and other media of widespread communications." [22]

■ The Commission's policy as explained and applied in this case not only seems clear and quite within the Commission's competence, but comports precisely with this court's treatment of the problem, as a matter of principle, in the McClatchy case.[23] There we had approvingly leaned to the Examiner's statement that the diversification factor should not weigh against an applicant already engaged in the dissemination of informa-

tion to the public unless there had been exhibited a monopolistic tendency or unless a grant to such an applicant would tend to create a monopoly. Even so, we noted that the Commission, in given circumstances, was completely within its prerogative when it there disagreed with its Examiner. That the Commission has a choice we recognized, even where we thought the Examiner's conclusion might well have prevailed. We upheld the Commission.

■ In short, the diversification factor is important, but may be counterbalanced by other factors. Our test lies in whether or not in the Commission's performance of its duty of determining which applicant will better serve the public interest, it is shown to have considered diversification of control in connection with all other relevant factors, and that such significance as may attach has reasonably been weighed and is rationally supported by the record, as the Commission finally evaluated the effect of this factor. It may reject a newspaper's application and grant that of a competing non-newspaper applicant if it acts reasonably, and if it does so after considering and comparing all other relevant factors. The converse is equally true.

■ We have considered the problem at length because of its clear importance in the overall setting before us. We cannot say that the Commission has acted unreasonably.

■ Against the broad background of the area to be served and considering the many outlets for expression of every possible viewpoint on every conceivable subject, we cannot assume that any party to this case, combining the various media of mass communication, could achieve any significant control over the minds and the thinking of the listening audience affected.[24] We are satisfied, in

22. 13 Pike & Fischer Radio Reg. at 585.

23. Supra note 15.

24. We are not unmindful of the situation prevailing in the District of Columbia area. The Washington Post Company publishes the daily and Sunday editions of the Washington Post and Times Herald and is owner of WTOP-TV and of WTOP-AM and FM broadcasting stations. At the same time the Evening Star Newspaper Company daily publishes

short, that the Commission has exercised its permissible judgment with respect to the weight to be given to the factor under scrutiny. Although under earlier legislation we had been authorized to act as a revising authority, Congress has terminated our administrative oversight. We are restricted to purely judicial review and may correct only errors of law.[25] We find no basis upon which we may substitute our judgment for that of the Commission that the award here made is in the public interest.

## V

█ Since review had here been sought under 47 U.S.C.A. § 402(b), the Act [26] commands that in the exercise of our function we will be guided by § 10(e) of the Administrative Procedure Act.[27] We have undertaken, so far as necessary to decision and where presented, to decide the relevant questions here raised. We have reviewed the record and have taken due account, as the statute reads, "of the rule of prejudicial error." The Commission's choice may not have been inevitable, but the discretion to choose is wide. We cannot say that abuse has been demonstrated or that the Commission has not acted in the public interest.[28] We are satisfied that the Commission's findings and conclusions are not lacking in substantial support on the whole record. Accordingly, and without more, we would now be bound to affirm. We thus rule

definitively so that repose may enfold this litigation if the steps next to be prescribed shall disclose no vitiating developments.[29]

## VI

While the lengthy record here has been under study the Commission moved to remand cases No. 13718, No. 14021 and No. 14170, WKAT, Inc. v. Federal Communications Commission, and No. 13725, Eastern Airlines, Inc. v. Federal Communications Commission. After argument by all counsel we entered our order of remand. We took note that public charges had been made in the course of a Congressional investigation of regulatory agencies [30] that one of the Commissioners who participated in the proceedings before the Commission, but who had since resigned, should have disqualified himself in that case. That Commissioner had participated in the instant case, as our record shows, but whether or not he should also have been disqualified here, does not appear.

█ The Commission in the Channel 10, Miami, cases had lodged with the clerk of this court a transcript of the Congressional hearings. In the course of our study of that transcript we observed from Vol. 28, commencing at page 4,180 and from following pages, as disclosed by another Commissioner's own sworn testimony, that various individuals connected with some of the parties to the

the Evening Star with its Sunday edition and owns the Evening Star Broadcasting Company which operates WMAL-TV and the WMAL-AM and FM broadcasting stations. It may be doubted that the populace of the District of Columbia and the surrounding areas served by these various media is aware of any significant deprivation of access either to current news or to opinion expressed. Certainly no such combination of media exercises "dominant" or even measurable control over local thought. Cf. Clarksburg Pub. Co. v. Federal Communications Comm., 1955, 96 U.S.App.D.C. 211, 225 F.2d 511.

25. Federal Communications Commission v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656.

26. 47 U.S.C.A. § 402(g) (1952).

27. 5 U.S.C.A. § 1009(e) (1952).

28. Scripps-Howard Radio v. Federal Communications Comm., supra note 5; Johnston Broadcasting Co. v. Federal Communications Comm., 1949, 85 U.S.App. D.C. 40, 46, 175 F.2d 351, 357.

29. We cannot now know what may be the state of the record after the hearing we are ordering. Fleming v. Federal Communications Commission, 1955, 96 U.S. App.D.C. 223, 226, 225 F.2d 523, 526; cf. United States v. Shotwell Mfg. Co., 1957, 355 U.S. 233, 241 et seq., 78 S.Ct. 245, 2 L.Ed.2d 234.

30. Conducted by the Special Subcommittee on Legislative Oversight of the House Committee on Interstate and Foreign Commerce.

instant appeals had conferred with him with reference to the pending case while the matter was under consideration by the Commission and before the issuance of its final decision on April 25, 1957. Among such individuals were one Forrester Clark of MBT, one Robert Choate of WHDH, and certain representatives of the Boston Globe.[31] Whether or not others to us unknown may have acted similarly, or whether or not any such individual named or unnamed, approached any other Commissioner and, if so, with what result, if any, we cannot know from the present record. Nor does it appear that any such persons actually represented or purported to speak for any of the parties here, or whether such parties had knowledge of such action as may have been taken.[32]

Our order of April 17, 1958, in the above identified Channel 10, Miami, proceedings, directed that those cases be remanded to the Commission with instructions to proceed forthwith to hold an evidentiary hearing concerning the possibility that the award theretofore made might be void *ab initio*, or voidable and that a party or various parties, might be disqualified by reason of misconduct to receive an award of a television permit. We directed that the Commission make, but not be limited to, findings of fact in certain specified particulars.

We now direct a similar evidentiary hearing in this case. Adapting as pertinent to the instant situation, the formula previously prescribed as above, the findings shall include, but not be limited to:

Whether or not any *member* of the Commission should have disqualified himself in the present case;

Whether any *person* or *persons* influenced or attempted to influence any member of the Commission in any manner whatsoever except by the recognized and public processes of adjudication (see Root Refining Co. v. Universal Oil Products Co., 3 Cir., 1948, 169 F.2d 514, 534–535, 540–541, and if so, the full facts and circumstances;

Whether any *party* to the proceeding before the Commission directly or indirectly secured, aided, confirmed, ratified, or knew of any misconduct which may be found by the Commission to have occurred;

---

31. Mr. McConnaughey testified:

"They came in my office with two brothers or cousins and they just read the riot act to me about ever granting this, about ever considering voting for the Boston Traveler or whatever it is. They were not even parties.

\* \* \* \* \*

"The Chairman: For or on behalf of anybody?

"Mr. McConnaughey: Yes. They just came in to tell me. I don't know who else they talked to." Transcript p. 4, 185. [The date of this conference does not appear.]

32. The spirit of the law and what lawyers are to understand that spirit to be may be discerned from the following: 47 U.S.C.A. § 409(c) (1) provides that no examiner conducting an adjudicatory hearing "shall \* \* \* consult any person \* \* \* on any fact or question of law in issue, unless upon notice and opportunity for all parties to participate." Nor shall any such examiner advise or consult with the Commission with respect to the initial decision or exceptions. 47 U.S.C.A. § 409(c) (2) provides with reference to an adjudicatory hearing, that "no person who has participated in the presentation or preparation for presentation of such case before an examiner \* \* \* or the Commission \* \* \* shall \* \* \* directly or indirectly make any additional presentation respecting such case, unless upon notice and opportunity for all parties to participate." The Canons of Ethics of the Federal Communications Bar Association prescribe as to contested proceedings, that "it is improper for lawyers to communicate privately with a Commissioner \* \* \* concerning the merits of a pending cause in the absence of opposite counsel or without notice to them." Lawyers are to use their best efforts to restrain and to prevent "clients from doing those things which the lawyer himself ought not to do, particularly with reference to their conduct towards the Commission." We know of no dereliction in any of the foregoing respects by any attorney for any party in this case.

Whether or not in the light of such findings, the grant of a permit for Channel 5, Boston, was void *ab initio* and if not, is voidable and action should be taken to set it aside, and whether any one applicant or more than one may have been disqualified to receive a grant of its application; and

Whether the conduct of any applicant if not of a disqualifying character, has been such as to reflect adversely upon such applicant from a comparative standpoint.

WHDH, Greater Boston, MBT and Du-Mont, as parties to the case before the Commission, are to be admitted, if they so desire, to participate as parties in the reopened evidentiary hearing. Any person or persons concerning whom evidence may be received in such hearing is, upon request, to be permitted to cross-examine and to submit rebuttal testimony. Of course, as in the Channel 10, Miami, case, the Commission shall notify the Attorney General of the United States of the pendency of the hearings and of their purpose that he may, through his designated representative, upon request made, participate in the hearing as amicus curiae.

Our order will provide that the status quo is to be maintained, and that we retain jurisdiction of these appeals pending receipt of the findings and final report of the Commission. In addition the Commission will within 60 days from the date of our order, report to this court its progress, with such recommendations as to the Commission may seem desirable at that stage of the proceeding.

5 U.S.C.A. § 1037(c) expressly authorizes a party to an appeal under 47 U.S.C.A. § 402(a) to apply for leave to adduce additional evidence under circumstances there defined. We held in the Channel 10, Miami, proceedings that what was explicit as an added procedural course in a § 402(a) review was implicit in the exercise of our review function

pursuant to the Commission's motion in a § 402(b) appeal.[33] Clearly, under 47 U.S.C.A. § 402(h), were we to reverse the Commission's order, upon remand it would become the duty of the Commission to act on the basis of the proceedings already had "unless otherwise ordered by the court."

But we have hitherto observed that after-discovered circumstances, even without the fault of an agency, may preclude a proper and just result.[34] Proof of the lack of competency of a party to receive an award may require an adjustment of the relief otherwise to be accorded. Improper influence, if established, going to the very core of the Commission's quasi-judicial powers is certainly critical. We should have the benefit of the Commission's determination in such matters before deciding ultimately what disposition should be made of this case. We recognize the primary responsibility and function of the Commission itself in these particulars.

Accordingly, it is to be understood that it is for the Commission initially to determine, subject to review in usual course, the competence of its individual members to have participated in the award, but with appropriate findings with respect to its ultimate conclusions. We deem it the Commission's proper duty and function to determine the basic qualifications of each of the four named parties who may appear in the evidentiary hearing as they participated before the Commission on October 29, 1956.

We will expect the progress report in due course as indicated, and ultimately in the light of developments, such findings as to the issues defined in this Part VI as may supplement the record upon which this appeal had so far been based.

Remanded accordingly.

EDGERTON, Chief Judge, concurs in the remand, but dissents from the court's action in ruling on the merits at this time.

33. Scripps-Howard Radio v. Federal Communications Comm., 1942, 316 U.S. 4, 16, 17, 62 S.Ct. 875, 86 L.Ed. 1229.

34. Fleming v. Federal Communications Commission, supra note 29.