## Commonwealth v. Cohen

*C. Theodore Fritsch, Jr.,* for Commonwealth.
*Stuart Wilder,* for defendant.

BIESTER, JR., *J.*, July 26, 1982—Defendant has filed a petition pursuant to the provisions of the Post-Conviction Hearing Act. Essentially what is raised as the matter has been ultimately briefed to the court is that defendant was denied effective assistance of counsel in that defendant's counsel advised defendant to waive his pre-trial motions in order to receive an opportunity to be administered a polygraph examination and in that defendant's counsel failed to object to the admission of evidence that defendant took and failed that polygraph examination and that defendant was denied effective assistance of appellate counsel in that defendant's attorney did not pursue any post-trial motions beyond boiler plate motions and did not pursue any appeal from the sentence defendant received.

We believe that the issues may be distilled down to the question of whether defendant's attorney rendered ineffective assistance of counsel in facilitating the taking of the polygraph examination and in counseling agreement to the admissibility of the results of the examination in the event defendant failed the examination and in declining to object to the admission of those results at trial.

Although defendant has raised issues of ineffectiveness of counsel with respect to the post-verdict motions and post-sentence failure to appeal, the only substantive issue which defendant raises in his brief apart from the failure to take more vigorous procedural steps is the issue of the admission of the results of the polygraph examination. Although defendant initially raised a number of other substantive issues, a fair reading of defendant's attorney Eisman's testimony and a fair reading of the record demonstrates to this court and apparently

had demonstrated to present counsel for defendant (in light of his briefing only the polygraph issue) that the various other substantive issues relating to various post and pre-trial motions and other matters lacked sufficient merit to warrant raising in post-verdict motions or on appeal.

We therefore now take up the question of whether the decisions of defendant's attorney with respect to seeking the polygraph examination and declining to object to its admission had some reasonable basis: Com. v. Everett, 297 Pa. Superior Ct. 320, 443 A. 2d 1142 (1982).

First the context of Mr. Eisman's decision-making process has to be understood. Defendant was charged with robbery, and there were four eyewitnesses who had identified him and were prepared to identify him at trial as one of the perpetrators. Both defendant and his attorney were concerned because of the overwhelming nature of the evidence against him. It was defendant himself who initiated the idea of taking the polygraph test. The practice in the Bucks County District Attorney's office at the time of the taking of this polygraph examination was essentially that if defendant passed the examination the case would be nolle prossed, and if defendant failed the examination the fact of that failure would be admissible into evidence and defendant would agree to waive any objection to its admissibility.

In light of the overwhelming nature of the case against defendant, one could understand that defendant would clutch at any straw that might be available. The considerations which Mr. Eisman took into account in making the judgments which he made are fully set out in his testimony which testimony the court found credible and believed:

BY MR. FRITSCH:

"Q. Excuse me. Why did Mr. Cohen tell you that he wished to take the polygraph test?

A. He maintained his innocence. He said that he felt this could prove his innocence and in the posture of the case, the way the Commonwealth's evidence stood, I think both Allen and myself were concerned because of the overwhelming nature of the evidence again [sic] him that this was probably the only way he could show his innocence."

• • •

"Q. And did you, in fact, explain to Mr. Cohen the ramifications of taking that polygraph test with respect to the stipulation and the agreement to nolle prosse the case?

A. I did.

Q. At any time did he tell you that he did not wish to take the test under that agreement?

A. No. He insisted he wanted to take the test, that the test would prove that he was innocent.

Q. And in a case such as this, as you mentioned, would it have been your advice to him to take such a test in light of the fact that there were four eyewitnesses to this particular crime who had identified him?

A. Well, my initial advice was that before he takes a lie detector test administered by the District Attorney's Office up here, that we get our own person in to take our own lie detector test to insure that the results would show, in fact, his responses would be correct. At that time, I think there was a financial problem, and I think Mr. Cohen was so convinced he would pass the lie detector test because he strongly maintained his innocence, that he didn't feel it was necessary.

Q. Now, with respect to the admission of the

polygraph results at trial, did you object to the admission of the results at trial?

A. I had made an agreement with the District Attorney's Office, Bucks County, and I did not think it was professionally responsible or honest or—to go against that agreement."

Mr. Eisman further went on to amplify his reasoning with respect to the interrelationship of certain pre-trial motions and their disposition and the matter of the projected lie detector test. His testimony in that respect was as follows:

"MR. EISMAN:

My motion to suppress covered all statements made by the defendant. This letter was sent because information was brought to me, I believe, from the family saying that these people were involved, it was pending before Judge Beckert on the nolo plea and I believe that that time, that by going to Judge Beckert, it would insure that if any investigation was going to take place, it would be done under the judge's supervision, not just thrown in the waste basket if the District Attorney's Office didn't want to pursue it.

Q. Do you recall any reason for not pursuing the motion to suppress and the in-person identification of Mr. Cohen at the preliminary hearing?

A. I don't recall any specific reason for not pursuing any of the other motions except that after reviewing all the facts, that it was my professional judgment that, not only would it be wasting the Court's time, but probably harming the overall situation with respect to Allen by pursuing these motions.

Q. How would it harm the situation?

A. Well, as I said before, there were a lot of fac-

tors involved with Allen Cohen's case, a lot of which we have not explored; but Allen was, I believe, on parole at the time, had a substantial amount of back time facing him. He also had a record, which, for his age, unfortunately, was extremely lengthy. I don't know how many pages it was, but having been involved in representing him before, I know that it was a very bad and extensive record. We had a fundamental decision to make in this case at the time it came up to the end of March on these motions, and that was were we going to litigate every single motion and then litigate a full length jury trial and then take our chances with regard to the evidence which was about as overwhelming as I have seen in a robbery case with four eyewitness identifications of Mr. Cohen and his prior record, or were we going to try to somehow either minimize damage or get him out of it, those were the different factors involved; and we are talking six years ago, so, there is probably some other factor involved that I don't remember at this point; but we came up to March 30th, we had our motions listed, and we had Mr. Heckler, who was a, I would describe him as a very vigorous Assistant District Attorney, who felt that because of Allen's substantial criminal record, prior history of robberies and everything else, with regard to drugs, which I believe was Allen's basic problem; but he felt that Allen should go away for a very long period of time, and he was going to see that that was done. On the other hand, we had Allen, who was professing his innocence, but also understanding the situation he was in, knew that had he gone the long route, that the chances of him going to jail in Bucks County for a long time were excellent.

These were just some of the factors that were coming into play when we came up to the time for

the motions. At that time, Allen said I will take a lie detector test to prove my innocence, and Mr. Heckler at first did not want to agree to it, and this was purely up to the District Attorney's Office, whether they would even get—enter into any agreement, let alone this agreement; and I began to negotiate with Mr. Heckler, and Mr. Cohen insisting on one hand he was innocent and there was no problem with the lie detector, and the question whether we would proceed to motions and trial at that time, and it was decided after discussing the matter completely with Mr. Cohen that in light of everything that we knew about the case, that this was his best chance of getting out of this because he said he was innocent. He said he would have no problem passing the lie detector, and that was the reason why we decided to proceed the way we did.

Other factors involved too, I think there were serious problems with the alibi witness which got worse, as these things sometimes do, and serious problems with regard to the defendant's case overall. That was one of the reasons why we eventually made a deal for the nolo plea.

Q. As to the polygraph, you simply felt bound to pursue that, that agreement that you signed, because you thought that as an attorney or as an honorable man couldn't go back on that agreement?

A. Well, whenever you enter into an agreement and it doesn't come out the way you want to, they were so sure of their case at first, they didn't want to agree to it. It was really my urging and assistance [sic] and telling them, look, you don't want to send an innocent man to jail, this guy is insisting that he didn't do it; and Mr. Heckler was very, very skeptical—I guess would be the best term—but he was almost laughing at me when I was insisting that my client was insisting he was innocent, I

believe him, that he wanted to take a lie detector test because he had this evidence in front of him with four eyewitnesses who were going to say this was the guy that held them up."

The trial in this case took place on December 6, 1976 before the Honorable John Justus Bodley. The two cases on which defendant most strongly relies with respect to the admissibility of polygraphic examination results are Com. v. Pfender, 280 Pa. Superior Ct. 417, 421 A. 2d 791 (1980) and Com. v. McIntosh, 291 Pa. Superior Ct. 352, 435 A. 2d 1263 (1981). Both of those decisions were rendered long after the subject trial and the subject decisions of counsel took place. The status of Pennsylvania cases dealing with the subject of the admissibility of polygraph results upon stipulation at the time Mr. Eisman made his decision and thereafter until Pfender is accurately and comprehensively described by Judge Cavanaugh in his opinion in Com. v. Pfender, supra in the following language:

"On the precise issue of admissibility of the polygraphic evidence pursuant to stipulation we find that the Pennsylvania cases have only incidentally touched upon the subject. In Com. v. McKinley, 181 Pa. Super. 610, 123 A. 2d 735 (1956), the court held that the trial judge properly instructed the jury to ignore any evidence of the defendant's offer to take a lie detector test. In so holding, the court stated:

'In the absence of a stipulation of the parties to the contrary, the results of lie detector tests are inadmissible when offered in evidence for the purpose of establishing the guilt or innocence of one accused of a crime, whether the accused or the prosecution seeks its introduction.'

"We do not deem this statement as being any

authority for the admission of polygraphic evidence by stipulation. The court was simply supporting its conclusion that the results of such tests are inadmissible and that therefore any evidence of an offer to undergo the test would likewise be inadmissible.

In Com. v. Chapman, 255 Pa. Superior Ct. 265, 386 A. 2d 994 (1978) our court had before it the issue of the refusal to permit a polygraph examination of a defendant under stipulation that the results would come into evidence. The court in a brief footnote (F.N. 15, p. 288, 386 A. 2d 994) dismissing "other points" rejected the argument citing Com. v. Gee, supra, and Com. v. Brooks, 454 Pa. 75, 309 A. 2d 732 (1973).

It appears then, that the question of admissibility of polygraphic evidence by stipulation has yet to be squarely met in Pennsylvania." 421 A. 2d at 794.

We can scarcely hold that Mr. Eisman was demonstrating ineffectiveness of counsel in declining to object and thereby preserving for appeal an issue which he had agreed to waive in order to achieve an opportunity for dismissal of the case which opportunity both he and defendant, urgently wished to take advantage of.

It should be noted that there was an issue that Mr. Eisman regarded as a viable question with respect to the polygraph examination as to which he did not feel bound by his agreement to waive. He vigorously brought to the attention of the court and objected to the use of the polygraph results on the basis of his having learned this his client was prepared to testify that the client was under the influence of drugs at the time the polygraph examination took place. In fact Mr. Eisman called Mr. Cohen to testify in the absence of the jury on the special point of the potential influence of drugs

upon Mr. Cohen and therefore the results of the polygraph examination. See Notes of Testimony of the PCHA hearing, pages 34 through 41.

Although current counsel does not press the matter in his brief we will advert briefly to two issues which were raised earlier. Among the motions filed by Mr. Eisman pre-trial, was a motion to suppress the photographic lineup and suppress any identification due to suggestiveness in any such lineup. Mr. Eisman explained his treatment of that motion in the following terms:

BY MR. FRITSCH:

"Q. Now, with respect to the pre-trial motions, Mr. Eisman, which you mentioned you had filed, first the motion to suppress the photograph lineup and to suppress any identification due to suggestiveness, did you, in fact, pursue that motion prior to trial?

A. Well, I pursued it to the extent I filed the motion and prior to our hearing, I believe it was Detective Armitage, with the acquiescence of Assistant District Attorney Heckler, made available to me his file and discussed the matter with me and showed me the photospread that was used in this case; and as I recall, I was very—I would say impressed with the thoroughness that Detective Armitage had exhibited and his preparation wasn't something I normally saw in Philadelphia, certainly. And most detectives that I had dealt with had not had as complete a report. He had reports—I don't know how many pages they were, but it was a very big report, and all of the photographs which were used in the spread were there; and, quite honestly, it was, in my professional experience, dealing with hundreds of these cases, probably one of the better

spreads that I had seen. With regard to that motion, I felt it would be inappropriate or at least wasting everyone's time, including the court's time, to proceed with that motion because the spread appeared to me to be very fair.

Q. Very fair?

A. Didn't really appear to be any firm grounds for proceeding on that motion."

With respect to the issue of Rule 1100, the records adduced at the PCHA hearing which the court finds to be accurate indicate that the date of the complaint was September 30, 1975; that there was a waiver signed covering the period of January 12, 1976 to March 31, 1976; a further waiver was signed covering the period of April 5, 1976 to April 28, 1976 and yet another waiver covers the period of April 27, 1976 effective to the date of defendant's plea of nolo contendre which was entered May 20, 1976. On the date of sentencing pursuant to that nolo plea the plea was withdrawn and that date was October 18, 1976. The date of trial was December 6, 1976. Obviously under those circumstances there was no credible basis for a Rule 1100 motion and Mr. Eisman explained his reasoning that he did not file a Rule 1100 motion because there had been sufficient written waivers, and that there was no speedy trial issue in the matter. We find that there was in fact, no such Rule 1100 issue in the matter.

We therefore hold that Mr. Eisman's conduct had some reasonable basis and defendant was not denied effective assistance of counsel. Since the only substantive point briefed by defendant's PCHA counsel was the polygraph issue, and in light of our decision with respect to it, Mr. Eisman is not to be faulted for failure to raise it post-trial. We find that

Mr. Eisman did not agree to file an appeal from sentence and therefore there is nothing on which to base a finding of ineffective appeal counsel.